**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
WARREN BOWLES,                        :
                                      :
            Plaintiff,                :
                                      :
            v.                        :   00 Civ. 4213 (BSJ)(MHD)
                                      :
NEW YORK CITY TRANSIT AUTHORITY,      :
                                      :
            Defendant.                :
------------------------------------x   **Opinion and Order**
WARREN BOWLES,                        :
                                      :
            Plaintiff,                :
                                      :
            v.                        :   03 Civ. 3073 (BSJ)(MHD)
                                      :
NEW YORK CITY TRANSIT                 :
AUTHORITY, and OLIVER CATO,           :
Individually and as a Labor           :
Relations Representative,             :
                                      :
            Defendants.               :
------------------------------------x
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

        Plaintiff Warren Bowles ("Bowles"), who at all times

relevant was an employee of Defendant New York City Transit

Authority ("Transit," "NYCTA"), originally brought these two

suits as separate actions.  In the first-captioned matter (the

"Accommodation Action"), Bowles alleges that Transit's delay in

granting his request for a religious accommodation to his work

schedule violated his "free exercise rights under the First

Amendment pursuant to 42 U.S.C. § 1983;" Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"); and

the New York State Human Rights Law ("NYSHRL"), McKinney's Exec. Law § 296(10)(a).[1] First Amended Complaint in the Accommodation Action (the "Accommodation Complaint"), at 13.

In the second-captioned matter (the "Retaliation Action") Bowles alleges that he was subjected to various adverse employment actions including dismissal in retaliation for his having filed the Accommodation Action, in violation of his free speech rights under the First Amendment;[2] Title VII; the NYSHRL, McKinney's Exec. Law § 290 *et seq.*; and the New York City Civil Rights Law, Administrative Code of the City of New York, § 8-101 *et seq.* ("NYCCRL").

Before the Court are the cross-motions of Transit and of Bowles for summary judgment in both actions. Also before the

[1] In the Accommodation Complaint, Bowles asserts a claim under Section (1)(c) of the NYSHRL. Because that section does not prohibit religious discrimination, the Court assumes that he means to claim under Section 10(a), which reads in pertinent part: "It shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a Sabbath or other holy day in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business." McKinney's Exec. Law § 296(10)(a).

[2] Bowles makes this allegation in the introductory paragraphs and elsewhere in the narrative sections of his Complaint in the Retaliation Action (the "Retaliation Complaint"). However, in the section captioned "IV. Plaintiff's Causes of Action," Retaliation Complaint at ¶¶ 131 – 168, Bowles does not assert a separate retaliation claim under the First Amendment. Rather, he alleges that his filing of the Accommodation Action and of various grievances and his exercise of his religious beliefs together constitute the activities for which Transit retaliated against him, and thereby form part of the factual predicate for his Title VII claim.

Court is Bowles's motion to consolidate the two actions.
Because these actions clearly involve common questions of law
and fact, Bowles's motion to consolidate them is GRANTED,
pursuant to this Court's authority under Rule 42(a) of the
Federal Rules of Civil Procedure.  For the reasons set forth
below, Bowles's motions for summary judgment are DENIED and
Transit's motions for summary judgment are GRANTED, in their
entirety.

## I. JURISDICTION

This Court has jurisdiction over claims under Title VII
pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over
the state and city law claims under 28 U.S.C. § 1367(a).

## II. BACKGROUND

### A. Plaintiff Bowles

Plaintiff Warren Bowles is one of several ordained
ministers of the Fellowship Tabernacle Ministries, Church of God
in Christ (the "Church"), located in the Bronx, New York, where
he has been an active member since about 1994.  In addition to
serving as one of the Church's ministers, Bowles is also a
Superintendent of the Church's Sabbath School.  The Church holds
Sunday services at noon and 3:30 p.m., and a Sabbath School
class at 10:45 a.m.

There is evidence in the record that the Church teaches
that its members are to observe the Sabbath by refraining from

work on Sundays.  There is a conflict in the record, however, as
to the precise parameters of this teaching.  At his deposition,
Bowles testified that he understood that he was forbidden to
work at any time during the 24 hours from midnight Saturday
until midnight Sunday.  *See* Transcript of Bowles's Deposition
("Bowles Dep."), attached as Exhibit J to Defendant's Statement
of Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1
Statement"), at 409 l. 22-24, 418 l. 14-17.  However, two
letters written by Bowles's Pastor, described more fully below,
seem to indicate that the prohibition is against work only "from
sun-up till sun-down" on Sundays.

In 1999, Bowles was hired as a Subway Cleaner in Transit's
Division of Stations.  In April of that year he reported for two
weeks of classroom training, after which he received a work
assignment as a "Night Extra."  In that capacity he worked from
10:00 p.m. to 6:00 a.m., with Saturdays and Sundays as his
regular nights off.

In or around June 1999, Bowles was instructed to report to
the Division of Stations to participate in the job assignment
"Pick System."  This is a system whereby employees are allowed
to choose particular work "tours" – including work location,
hours, and regular days off – within their job classifications.
The Division of Stations holds Picks every six months.  Thus,
the tour an employee selects at a Pick is the one he will have

4

for the following six months.

An employee is required to select a tour at each Pick.
Under the system, each employee chooses from available tours
when his turn comes up. The most senior employees pick first,
and accordingly they have the widest range of choices available
to them.

At the June 1999 Pick Bowles, as a very recent hire, was
rather far down in the pick order. By the time his turn came,
there were no tours left that did not require some Sunday work
hours. He selected a tour that required him to work from 11:00
p.m. until 7:00 a.m., Friday through Tuesday, with Wednesdays
and Thursdays as his regular nights off, beginning in July,
1999. The assignment thus required that he work a full eight
hours on Sundays, from midnight until 7:00 Sunday mornings and
from 11:00 p.m. until midnight Sunday nights – leaving him off
only from 7:00 a.m. to 11:00 p.m. Sundays.

**B. The Accommodation Action**

According to Bowles, immediately after making his pick he
went to Station Command and requested help in obtaining a
religious accommodation to his new work schedule. He was given
the appropriate form, known as a "G2." In the subject line of
the G2, attached as Exhibit D to Def. 56.1 Statement, Bowles
wrote "Sabbath Observation," and explained, "I am requesting to
have Sundays off so that I may attend religious services to

[*sic*] which I am a part of."  The form is signed and dated June 9, 1999.

According to Bowles, when he returned the completed G2 to Superintendent Maureen Campo of Station Command, she told him "something to the effect that it will be denied," Bowles Dep. at 77 l. 19-20.  He showed her his minister's license, which she photocopied.  Campo then told Bowles to have his Church Pastor provide a letter in support of his request.  Bowles apparently was not asked for and did not offer any explanation of his request other than the written form.

As Campo had instructed, Bowles obtained a letter from Rev. Jay Gooding, the Pastor and Founder of the Church, and submitted it to Amelia Harrison, then Acting General Superintendent of the Division of Stations, to whom Campo had forwarded Bowles's G2 for action.  The letter, on Church letterhead, is dated June 14, 1999 and reads in its entirety:

> Dear Superintendent Campo,
>
> This letter is in reference to the request of Mr. Warren Bowles, that he not be scheduled to work on Sundays, due to our Sabbath observance.  Mr. Bowles is an associate minister, as well as the Sabbath school superintendent at the Fellowship Tabernacle Ministries.  He is an integral part of our church ministry, and his absence would create a serious void in our Sabbath services.
>
> It is our religious belief that we observe our Sabbath day as a day of giving our all (including service) to God.

> We would pray that you would consider this letter, when scheduling Mr. Bowles's working shift.
>
> If there are any questions regarding this matter, please do not hesitate to contact Pastor Gooding at [telephone number].
>
> Thanking you in advance,
> [signature]
> Pastor Jay Gooding

Bowles testified that when he submitted the letter he asked Harrison whether his request for religious accommodation had been approved and she told him it had not. He asked why and, according to Bowles, she replied that there was "no such policy," Bowles Dep. at 187 l. 8-9. She then said Bowles could have Thursdays and Fridays off, and that if he were not satisfied with that he should seek work in the private sector. At her deposition Harrison testified that she did make such a statement, telling Bowles that "the private industry was the only industry that I still knew that gave every Saturday and Sunday off," Transcript of Harrison's Deposition ("Harrison Dep."), attached as Exhibit H to Plaintiff's Rule 56.1 Statement ("Pltf. 56.1 Statement"), at 109 l. 21-23.

As with Campo earlier, Bowles does not claim that he explained to Harrison his understanding that the Church prohibited work for the 24 hours of Sunday. Harrison stated frequently in her deposition that she understood that Bowles was requesting only that he not be scheduled to work at times that

would conflict with his attendance at Church services, *see, e.g.,* Harrison Dep. at 99 l. 3-7, 163 l. 6-14, and 196 l. 6-9, and that Bowles never informed her that he wanted all of Sunday off.  Harrison testified that she became aware of the true nature of Bowles's request only when she received a letter on his behalf from his union some time later, *see* Harrison Dep. at 196 l. 15-25.  Bowles does not contradict any of this testimony.

It is undisputed that Transit does in fact have policies whereby an employee can request and be granted a religious accommodation to his work schedule.[3]  The written policies state that such requests and their supporting documents are to be sent by the department to Transit's Office of Labor Relations for action.  However, deposition testimony revealed that an operating department – such as the Division of Stations, to which Bowles reported - that receives a request will sometimes grant it without review by the Office of Labor Relations, if the department has a job available that will accommodate the request without negative financial impact.  *See* Transcript of Deposition of Charles Glasgow, attached as Exhibit J to Pltf. 56.1 Statement, at 36 l. 12-21.  The policies do not specify what if any recourse is available to an employee whose request is denied.

---

[3]     The policies are embodied in a memorandum dated January 1984 from Brian Frohlinger, Manager of Labor Relations for Transit, and in a document entitled "Procedures for Religious Accommodation" dated June 3, 1996.  The two documents are appended to Def. 56.1 Statement as Exhibit C.

Campo testified that Transit has "always" offered Thursdays and Fridays off to those employees who work nights and request religious accommodation, Transcript of Campo's Deposition ("Campo Dep."), attached as Exhibit M to Def. 56.1 Statement, at 29 l. 15 – 30 l. 23.[4] There is testimony and documentary evidence, which was authenticated as all requests for religious accommodations received by Stations 1999-2000, *see* Exhibit H to Affidavit of Joann Gundersen, Zone Superintendent in the Division of Stations ("Gundersen Aff."), that numerous requests for religious accommodation have been received and granted by that division, some of which were for time off on Sundays. Harrison also testified that she "quite frequently" has reviewed religious accommodation requests for the entire day of Sunday off, Harrison Dep. at 43 l. 2-25.

After Harrison denied Bowles's request she told Bowles that he should speak with Bill Jones in Policy Compliance if he was dissatisfied with her decision. It is undisputed that Bowles did not speak with Jones, but instead went to Transit's Equal Employment Opportunity Office and spoke with Michael Fyffe, who was then employed as an investigator for that office. According

---

[4] While a policy that offers Thursday and Friday nights off gives some accommodation to those whose religious observances take place on Fridays and Saturdays, it obviously does not equally accommodate those whose observances occur on Sundays. This point was made to Transit on Bowles's behalf by Loretta Mines, an organizer for the Transport Workers Union ("TWU"), to which Bowles belonged. *See* Letter, dated August 6, 1999, from Mines to Harrison, attached as Exhibit D to Accommodation Complaint.

to Fyffe's notes from that meeting, taken on a "Counsel and Advise" form, dated June 14, 1999, which is attached as Exhibit F to Def. 56.1 Statement,

> Complainant [Bowles] stated that he needs Sundays off as a religious accommodation because he leads worship services at his church.  He further stated that he currently receives Saturday and Sunday off but that he will not be entitled to those days off for the upcoming employee pick.  He stated that he submitted a letter from his pastor but he was told by Station Command that unless a Saturday [and] Sunday job is available when he picks he could not be accommodated.

Fyffe referred Bowles to Transit's Office of Labor Relations.  Bowles called and spoke to Charles Glasgow, Director of Labor Relations for Bowles's division.  Glasgow referred Bowles to Barry Callwood, a supervisor in Labor Relations.  Cato prepared a "Change of Assignment / Vacation" form, attached as Exhibit F to Def. 56.1 Statement.  On the form Callwood changed Bowles's shift and days off for the period July 11 through September 18, 1999, subject to approval by Bowles's department. Callwood signed the form, dated it June 28, 1999, gave Bowles a copy, and forwarded the form to Harrison for approval.  In early July, Harrison telephoned Callwood and informed him that, based on her previous review of his G2, Bowles already had the accommodation he needed, since his schedule did not prevent his attendance at Church services.  Harrison Dep. at 122 l. 7 – 10.

On July 9, Callwood telephoned Bowles at home to let him know that the Change of Assignment form had not been approved.

Shortly thereafter, Bowles called the Transport Workers Union ("TWU") and spoke with Loretta Mines, an organizer.  She asked him to fax her both a letter from his Pastor and the form he had received from Callwood.

Bowles obtained a second letter from Pastor Gooding, dated July 14, 1999.  This second letter reiterates the first, but substitutes a new second paragraph which reads "It is our religious belief and Christian commitment to observe our Sabbath day, which is Sunday, from sun-up till sun-down as a day of giving our all (including service) to God."  Bowles faxed this letter and the form from Callwood to Mines sometime in mid-July.

Bowles eventually obtained a third letter from Pastor Gooding, dated July 21.  This letter also reiterates the June 14 letter, but its second paragraph reads "It is our religious belief and Christian commitment to observe our Sabbath Sunday. Nevertheless, our Christian doctrine, forbids Christians of any work on the Sabbath Sunday.  It is our lawful right to be in worship, from sun-up till sun-down, giving our all (including service) to God."

Mines corresponded with Harrison regarding Bowles, and submitted Pastor Gooding's letters to her early in August, 1999.

Sometime in December 1999 another Pick was held, for the following six-month period.  The parties disagree as to whether Bowles had the opportunity at that Pick to choose a tour that

did not require Sunday work, but it is undisputed that the tour

he chose required him to work from 3:00 to 11:00 p.m. Saturday

through Wednesday.  Obviously, with this pick Bowles had to

report to work several hours before sundown on Sundays.  Bowles

remained on that tour until nearly the end of that 6-month

period.

On January 5, 2000, Valerie Bynoe-Kasden, Senior Director

of Labor Research and Negotiations, sent a memo to Harrison,

attached as Exhibit P to Pltf. 56.1 Statement, which reads in

pertinent part:

> A review of our records indicates that Mr. Bowles's
> request was never forwarded to this office as is the
> standard operating procedure.  Please note that all
> Sabbath observance requests must be forwarded to Labor
> Research and Negotiations via the appropriate
> departmental labor relations representative for review
> and recommendation.

> Pursuant to Ms. Mines's submission, this office
> contacted a representative of Mr. Bowles's church and
> was informed that work is prohibited on the Sabbath.
> We therefore recommend that Mr. Bowles's request be
> Approved.

It is undisputed that Transit tried twice in 2000 to offer

Bowles an accommodation.  Sometime early in April of that year,

Superintendent Ea Mingo of the Stations Department phoned Bowles

at work to notify him that he would receive an accommodation.

Bowles, having filed a complaint with the Equal Employment

Opportunity Commission ("EEOC") on December 16, 1999 and having

received his Notice of Right to Sue on March 10, 2000, told

12

Mingo that she should speak with his attorney.

Transit next offered Bowles an accommodation in June, 2000,[5] when Bowles was ordered to appear at the Office of Labor Relations. On the appointed day Bowles, accompanied by a TWU representative whose name Bowles did not recall at his deposition, met with Defendant Oliver Cato, a lawyer for Transit's Office of Labor Relations. Cato again offered Bowles an accommodation and presented a Change of Assignment Form to him for his signature.[6] Bowles refused to sign in the absence of his attorney, *see* Bowles Dep. at 355 l. 9-10, and gave Cato his attorney's card. Bowles was then told to wait in the outer office, where Cato told him "maybe half an hour later" that he had spoken with Bowles's attorney on the phone and that his attorney "did not want [Cato] to communicate with [Bowles], and that was it," *id*. at 355 l. 22-25. Bowles does not explain why he did not arrange to have his attorney accompany him to the meeting.

---

[5]    Neither party specifies the date of this meeting.

[6]    Bowles alleges that the circumstances of this meeting, and the offer itself, were coercive. He says he was ordered to appear on his day off or face disciplinary action, Bowles Dep. at 352 l. 19-25. He also claims in his Opposing Statement of Facts as to Which There is no Genuine Issue to be Tried, at ¶ 77, that Cato's offer was "conditioned upon [him] signing a document waiving his ability to request future religious accommodations," but the portion of his deposition transcript to which he cites does not contain such an allegation. Transit did not comply with Bowles's discovery requests for a copy of this form, so it is not part of the record. At any rate, it is undisputed that an accommodation was offered.

Bowles filed the Accommodation Action on June 6, 2000.[7]  In

July 2000, the parties signed a stipulation that "Plaintiff

Warren Bowles is currently eligible for a religious

accommodation."  That stipulation was so-ordered by this Court

on July 20, 2000, and Bowles was given a schedule with Sundays

off.  However, by the time it became effective there was only

one Sunday remaining in that Pick period.  Bowles had meanwhile

participated in the April Pick, and had chosen a tour that gave

him Saturdays and Sundays off, Bowles Dep. at 351.  That tour

began in July, 2000.

## C. The Retaliation Action

Bowles alleges that subsequently Transit took numerous

actions against him in retaliation for his having filed the

Accommodation Action.  He says that he was put on probationary

status[8] and warned regarding sick time taken in December 1999

purportedly because he did not have a doctor's approval,

Retaliation Complaint at ¶ 108.  Bowles also alleges that a

Transit supervisor "improperly disclosed confidential

information regarding [his] medical status" to two co-workers,

apparently by telling them that Bowles was on a "sick leave

---

[7]    It is undisputed that Bowles complied with the various conditions
precedent to this Court's jurisdiction:  he filed a timely complaint with the
EEOC, received a Notification of Right to Sue from the EEOC, and filed the
Complaint with this Court within the specified ninety days of his receipt of
that notice.

[8]    There is no allegation that this probationary status actually entailed
any change in Bowles's duties or compensation.

control list," *id.* at ¶ 109.

Bowles states that in July 2000 he was assigned tasks not within his job title of Subway Cleaner, and alleges that these assignments were made in retaliation for his having filed the Accommodation Action.  Specifically, he was ordered by one supervisor "to deliver fare reports,"[9] and by another "to complete unpleasant tasks assigned to other teams, such as emptying [bagged] garbage from a refuse room and bringing it upstairs," *id.* at ¶ 111.

On November, 16, 2000, Bowles requested permission to use one of his vacation days to attend depositions in the Accommodation Action.  That request was denied, and when Bowles nevertheless attended the depositions he was listed as absent without leave as part of Transit's disciplinary process, *id.* at ¶ 110.  Bowles claims that this also was done in retaliation for his having filed the Accommodation Action.[10]

On March 6, 2001, Bowles injured his back shoveling snow on the job, but did not then seek medical attention or miss work. The injury was aggravated on June 20, 2001, and as a result Bowles was unable to work for several months.  During that time

---

[9]     Bowles avers that this task is usually performed by a supervisor, Bowles Dep. at 496 l. 19.

[10]    In his deposition Bowles also alleged that he suffered retaliation when he "show[ed] up for work and they didn't pay me until the following week, and I submitted a sick form, and because the doctors didn't put the dates . . . on the specific line they cited me for having an insufficient medical.  And it clearly covered me for the dates that I was out," Bowles Dep. at 465 l. 2 – 10.

he was examined by a NYCTA physician and by his own physician. On January 30, 2002, an independent medical examiner hired by Transit issued a report concluding that Bowles could return to work with certain restrictions. Bowles submitted that report to a Transit supervisor that same day, but the supervisor determined that there was no work available that Bowles would be able to perform.

On March 12, 2002, Bowles was terminated. The TWU filed a grievance on his behalf, which was heard initially by Defendant Cato in his capacity as a NYCTA hearing officer. Bowles objected to Cato hearing his grievance because Cato had by that time been deposed in the Accommodation Action concerning his April 2000 meeting with Bowles. The objection notwithstanding, Cato heard the grievance and denied it as untimely under the CBA, since it had been filed more than 30 days after the termination.[11] A second hearing officer affirmed Cato's ruling,[12] but the ruling was reversed in arbitration, *see* Opinion and Award of Richard Adelman, dated March 5, 2003 ("Arbitration

---

[11]    Defendants also point out that in his grievance Bowles requested not only reinstatement but also reclassification to a different job that offered tasks he could perform even though injured. Such reclassification is not available to employees in Bowles's classification of Subway Cleaner. Cato therefore denied the grievance on those grounds as well.

[12]    At that second hearing Cato served as Transit's Management Representative and "advocated in favor of terminating the Plaintiff," Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment in the Retaliation Action ("Pltf. Retaliation Memo"), at 5. According to Bowles, "it was not until the filing of [the Retaliation Action] that Defendant Cato was told by his supervisor to cease all work on Mr. Bowles's grievances to avoid the appearance of impropriety and/or bias," *id.* at n. 2.

Award I"), attached as part of Exhibit R to Defendant's Notice
of Motion to Dismiss (in the Retaliation Action).  Bowles was
ordered reinstated, and was given a restricted-duty work
assignment in accordance with his physical disability in June of
that year.

Bowles had meanwhile brought the Retaliation Action on May
1, 2003.  Bowles further complains that Transit continued its
retaliatory pattern *after* he filed the Retaliation Action.  He
was required to work through lunch (without eating) on six days
in July and September, 2003, Plaintiff's Memorandum of Law in
Support of Plaintiff's Motion for Summary Judgment ("Pltf.
Retaliation Memo") at 8.  Bowles claims that this was
particularly stressful and dangerous for him, because he is a
diabetic with hypertension.  He submitted two written complaints
about the issue and, according to Bowles, Transit "acknowledged
that he was entitled to lunch relief and that he should be paid
for the hours he worked through his lunch break.  The Transit
Authority was unable to identify to Plaintiff that he has been
paid for these hours," *id.*

Sometime in October 2003, Bowles "went out of service
again," claiming depression, "adjustment disorder" and pain from
his back injury, *id*.  "He was informed by his doctors that he
was unfit for service and he was also examined by independent
medical examiners from the Transit Authority," *id.*  He was then

17

informed by Transit without explanation on November 18, 2003
that he had been terminated effective October 10.  Bowles
grieved that termination.  His grievance was denied at the first
two levels of Transit's process.  On July 19, 2005 an arbitrator
upheld the termination but postponed its effective date until
January 25, 2005, and so awarded Bowles back pay through that
date.  *See* Supplemental Opinion and Award of Richard Adelman,
dated July 19, 2005 ("Arbitration Award II"), attached as
Exhibit W to Plaintiff's Notice of Motion for Summary Judgment
and to Consolidate Action[s] ("Pltf. Retaliation Motion").

Finally, Bowles claims that, sometime after April 2004, his
application for retirement benefits and medical insurance was
"unduly delayed due to the Transit Authority's failure to
provide information to the New York City Employee Retirement
System," Pltf. Retaliation Memo, at 15.

**D. Damages Claimed and Relief Sought**

Bowles alleges that his rights under the First Amendment,
Title VII and the NYSHRL were violated when Transit denied his
request for a religious accommodation.  Bowles alleges that
because of the denial of accommodation, he suffered economic
loss and several health problems, including hypertension,
"injuries to his nervous system . . . mental anguish," and
physical incapacitation.  He seeks a declaration of his rights,
a permanent injunction against Transit, and "restitution . . .

18

of all rights, privileges, benefits and income" that he would

have received but for Transit's conduct.[13]

Bowles further alleges that his two terminations, Cato's

denial of his grievance, and several other actions by Transit

after he filed the Accommodation Action were in retaliation for

his pursuit of that Action in violation of his rights under the

First Amendment, Title VII, the NYSHRL and the NYCCRL.  He seeks

a declaratory judgment as to his rights, a permanent injunction,

back and front pay, and reinstatement.[14]

Discovery and depositions were taken in both actions.

Transit moved on October 14, 2003 for summary judgment in the

Accommodation Action, and Bowles cross-moved on January 28,

2004.  In the Retaliation Action, Transit moved for summary

judgment on July 15, 2005, and Bowles cross-moved for summary

judgment on August 15, 2005.

### III. THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment may only be granted when "the pleadings,

---

[13]    In the Complaint, Bowles purports to bring his action on his own behalf
and that of the class of others similarly situated.  However, he has not
pursued class certification since filing the Complaint.

[14]    Bowles also seeks unspecified punitive damages.  Transit however is a
municipal corporation, and as such is not subject to punitive damages.  *See
Kolstad v. American Dental Assoc.*, 527 U.S. 526, 534, 119 S.Ct. 2118, 144
L.Ed.2d 494 (1999) ("A complaining party may recover punitive damages . . .
against a respondent (other than a government, government agency or political
subdivision . . .)); *see also Karoon v. New York City Transit Authority*, 241
A.D.2d 323, 324, 659 N.Y.S.2d 27 (1st Dep't 1997) ("The Court of Appeals has
clearly held that the State and its political subdivisions, as well as public
benefit corporations such as the instant Transit Authority defendants, are
not subject to punitive damages."); *Krohn v. New York City Police Dep't*, 2
N.Y.3d 329, 778 N.Y.S.2d 746, 811 N.E.2d 8 (2004) (punitive damages are not
available in an employment discrimination case against a municipality under
NYSHRL or NYCCRL).

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(b).

The party opposing summary judgment "may not rest upon mere allegations or denials," but must "set forth specific facts showing that there is a genuine issue for trial," *id.* at 56(e). While summary judgment is improper if there is any evidence from any source from which a reasonable inference could be drawn in favor of the non-moving party, *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994), a party cannot defeat summary judgment by "offering purely conclusory allegations," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985), or by offering evidence in opposition that is merely speculative, *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116-17 (2d Cir. 1988). "[I]f the [opposing] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, to defeat summary judgment, the opposing party must set forth "concrete particulars," *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984), by means of admissible evidence, demonstrating that a genuine issue of material fact remains. *See, e.g., G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 903 (S.D.N.Y. 1994).

The Court of Appeals for the Second Circuit has cautioned district courts to be particularly circumspect in deciding whether to grant summary judgment in employment discrimination cases because the ultimate issue – the employer's intent – is not well-suited to resolution at the summary judgment stage. *See, e.g.*, *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir. 1994); *Meiri,* 759 F.2d at 998. But the Circuit has also noted that "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* With this in mind, I turn now to a discussion of the merits of the motions before me.

## IV. DISCUSSION

## A. The Religious Discrimination Claims Under Title VII and the <u>NYSHRL</u>[15]

Title VII prohibits employer actions which affect an

---

[15]    Although Bowles's claims under state and city laws are technically pendent claims that could be dismissed on jurisdictional grounds if the parallel federal claims do not reach trial on the merits, the discrimination claim under the NYSHRL and the retaliation claims under both the NYSHRL and the NYCCRL will be analyzed, as they commonly are by district courts in this Circuit, in conjunction with his Title VII claims. *See, e.g., Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir. 1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII") (internal citations omitted); *see also Farias v. Instructional Systems, Inc.,* 259 F.3d 91, 98 (2d Cir. 2001); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir. 2000).

employee's "compensation, terms, conditions, or privileges of employment[, and those that] would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of the employee's religion, unless that employer "demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e-2(a)(1) and 2000e(j); *see also Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 481 (2d Cir. 1985); *Durant v. Nynex*, 101 F.Supp.2d 227, 233 (S.D.N.Y. 2000). "In brief, it is 'an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'" *Baker v. The Home Depot*, 2006 WL 1030231, at *4 (2d Cir. 2006) (quoting *Trans World Airlines. Inc. v. Hardison,* 432 U.S. 63, 74, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)).

There is thus a threshold difficulty with Bowles's claim: he cannot allege he was never accommodated, because the parties entered into a stipulation in July 2000 pursuant to which his schedule was actually accommodated by Transit shortly thereafter. Instead, Bowles argues that Transit is liable under Title VII for the almost one-year period between his submission of his G2 and the stipulation, during which he was not

accommodated.

The Court has been unable to find, and indeed the parties do not provide citation to, a decision that addresses when a delay in accommodating becomes for Title VII purposes a refusal to accommodate. But I note that in computing the delay here, the clock can start running against Transit only from when it was on notice of the specifics of Bowles's request.[16] On this issue there is uncontroverted evidence before the Court that Transit was not aware of the exact nature of Bowles's request until the Office of Labor Relations made the phone call referenced in Bynoe-Kasden's memo of January 5, 2000.[17] Thus, there was a delay of only four months between Transit's notice and its first offer of an accommodation, when Mingo called Bowles at work in April 2000. It is undisputed that Transit made a second offer in June, and finally in July the parties stipulated to Bowles's eligibility and he was accommodated shortly thereafter – some seven months after Transit was on notice. On this record, the Court finds the delay here cannot serve as a refusal to accommodate under Title VII.

---

[16]    Proof of such notice is the second element of a plaintiff's prima facie Title VII case, see infra.

[17]    Having considered whether Callwood's notes of his meeting with Bowles on June 28, 1999, can be read as evidence of an earlier awareness by Transit of the specifics of Bowles's request, the Court finds that they cannot. At any rate, because I find that Bowles has not established the third element of his claim, the question of when Transit was on notice is not dispositive.

But even if a seven-month delay in accommodating - the maximum chargeable here against Transit - were equivalent to a refusal to accommodate, Bowles's religious discrimination claim must still fail, because he cannot establish one of its elements.

To establish a prima facie case of religious discrimination a plaintiff must demonstrate that (1) he has a bona fide religious belief that conflicts with an employment requirement, (2) he informed his employer of this belief, and (3) he suffered some adverse employment action – typically, discipline, demotion, transfer or termination - for refusing to comply with the conflicting employment requirement. *See Philbrook,* 757 F.2d at 481.[18]

---

[18] The first element of Bowles's claim, that he show a bona fide religious belief that conflicts with some employment requirement, is not in doubt. It is true that there is a conflict in the record as to what exactly his Church teaches – whether members are forbidden to work at all on the Sabbath, as Bowles argues, or whether the prohibition is only "from sun-up till sun-down," as two of the letters from Pastor Gooding seem to indicate. But the question of whether Bowles's Church actually prohibits what he *believes* it prohibits is one that this court need not answer and indeed is uninterested in asking. *See Reyes v. New York State Office of Children and Family Services*, No. 00 Civ. 7693 (SHS), 2003 WL 21709407 at *6 (S.D.N.Y. July 22, 2003) ("In Title VII cases concerning religious discrimination, as in questions regarding the free exercise of religion, it is only appropriate for a court to engage in an analysis of the sincerity of a plaintiff's religious beliefs, and not the verity of those beliefs." (citing *Philbrook,* 757 F.2d at 482)); *see also Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978) ("[T]o restrict [Title VII to protecting] those practices which are mandated or prohibited by a tenet of the religion would involve the court in determining not only what are the tenets of a particular religion . . . but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion. . . . [S]uch a judicial determination [would] be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953), "[I]t is no business of courts to say . . . what is a religious practice or activity.").

This Circuit holds that the law thus requires a plaintiff
to demonstrate that he has "endure[d] a 'materially adverse
change' in the terms and conditions of employment. . . . A
materially adverse change might be indicated by a termination of
employment, a demotion evidenced by a decrease in wage or
salary, a less distinguished title, a material loss of benefits,
significantly diminished material responsibilities, or other
indices . . . unique to a particular situation." *Galabya v. New
York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). In
short, a complained-of action must have some real consequence in
terms of a plaintiff's working conditions.[19]

Here, the only employment action whatsoever that Bowles

---

Bowles's understanding of his religious obligation would thus be
outside the protection of Title VII only if it were found to be a personal
preference "wrapped in religious garb," *cf. Hussein v. Pierre Hotel,* No. 99
Civ. 2715, WL 406258 at *3 (S.D.N.Y. April 20, 2001). There is no evidence
in the record from which a finder of fact might infer that Bowles was or is
anything other than sincere in his belief, and indeed Transit does not argue
otherwise. So long as Bowles sincerely believed that his religion did not
allow Sunday work, he has made out the first element of his claim.

Instead, the aforementioned ambiguity is only important insofar as it
might bear on the *second* element: whether or when Transit was actually on
notice as to the true nature of Bowles's request. As mentioned, there is
uncontroverted evidence in the record that Transit did not have such notice
until the phone call referenced in Bynoe-Kasden's memo of January 5, 2000.
Moreover, because Bowles both fails to show that he was not accommodated and
fails to make out the third element of his claim, *see infra*, any ambiguity as
to the second element does not preclude summary judgment, even if it were to
be considered a question of material fact.

[19]   To be sure, the Circuit recognizes that "Title VII does not define
adverse employment action solely in terms of job termination or reduced wages
and benefits, and that less flagrant reprisals by employers may indeed be
adverse," and that, "because there are no bright-line rules, courts must pore
over each case to determine whether the challenged employment action reaches
the level of 'adverse.'" *Richardson v. New York State Dept. of Correctional
Service*, 180 F.3d 426, 446 (2d Cir. 1999). Nevertheless, "[t]o be
'materially adverse' a change in working conditions must be more disruptive
than a mere inconvenience or an alteration of job responsibilities."
*Galabya*, 202 F.3d at 640.

claims to have suffered in connection with Transit's alleged failure to accommodate him is Campo's comment that he should seek a job in the private sector if he wanted weekends off, which he construes as a threat of termination.[20]

In this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII.[21]  *See*, *e.g.*, *Massie v. Ikon Office Solutions, Inc.*, 381 F.Supp.2d 91, 100 (N.D.N.Y. 2005) (where plaintiff had received numerous warnings his "fear of being terminated [was] not an adverse employment action because of its lack of consequence"); *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y. 2001) (where a plaintiff was repeatedly warned but never disciplined, "such criticism,

---

[20]    Bowles was of course eventually fired, but that termination forms part of the factual basis of his retaliation claim, *see infra*, and is no part of his failure to accommodate claim.

[21]    Research has found only two decisions by courts of this Circuit that have explicitly held that an unrealized threat of termination satisfied the adverse employment action requirement:  *Khan v. Federal Reserve Bank of New York*, No. 02 Civ. 8893 (JCF), 2005 WL 273027 (S.D.N.Y. Feb. 2, 2005) and *Pruitt v. Metcalf & Eddy, Inc.*, No. 03 Civ. 4780 (DCF), 2006 WL 39621 (S.D.N.Y. Jan. 6, 2006).  In *Khan*, Judge Francis held that "the threat of an adverse action *is* sufficient . . . provided that the plaintiff can prove that the employer is in fact intransigent and that the threatened action is causally related to the conflict between the employer's policy and the plaintiff's religion," *id.* at *5 (emphasis added).  Similarly, Judge Freeman in *Pruitt* quotes *Khan* for the proposition that "the threat of a sanction is enough" to meet the third prong of the standard, *Pruitt*, 2006 WL 39621 at *10.  Judge Freeman does not actually reach the question of whether the *Pruitt* plaintiff had adequately alleged such a threat, because "the evidence in the record establishe[d] that Defendants offered Plaintiff a reasonable accommodation with respect to his beliefs."  *Pruitt*, 2006 WL 39621 at *10.
    Under even this broader standard – and assuming *arguendo* that Campo's comment *was* a threat – Bowles's claim cannot survive summary judgment.  He cannot show the required intransigent unwillingness on Transit's part to work out some solution, *cf. Khan*, 2005 WL 273027, at *5, for the simple reason that Transit did eventually accommodate him.

without any other negative results such as a decrease in pay or
being placed on probation, simply [could] not support
plaintiff's discrimination claims"); *Stembridge v. City of New
York*, 88 F.Supp.2d 276, 283 (S.D.N.Y. 2000) (acknowledging that
"an employment decision need not result in discharge to fall
within the Title VII protection," but holding that, where a
plaintiff failed to show that reprimand had "a cognizable or
material impact on the terms or conditions of his employment,"
he had not established an adverse employment action).

Thus, not only does Bowles's evidence fail to establish
that Transit refused to accommodate his religious beliefs, the
evidence is also insufficient to establish the adverse action
prong of his claim.  Summary judgment is accordingly GRANTED to
Defendant Transit with regard to the claims of religious
discrimination under Title VII and the NYSHRL.

## B. The Retaliation Claims[22]

### 1. Individual Liability of Defendant Cato

I note first that the fact that I have granted summary
judgment to Transit on the discrimination claims is not in and
of itself fatal to Bowles's retaliation claim.  A plaintiff need
not first prove that his underlying discrimination claim is
valid in order to establish a claim for retaliation under Title

---

[22]     As is true of his claim under the NYSHRL, Bowles's claim under the
NYCCRL is evaluated using the Title VII framework, *see supra* n. 15.

VII, *Sumner v. U.S. Postal Service*, 899 F.2d 203, 208-09 (2d Cir. 1990). However, I also note that Bowles's Title VII retaliation claim against Defendant Cato must be dismissed, as it is well-settled that individuals are not subject to liability under Title VII. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (holding that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *accord Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (affirming dismissal of Title VII claims against defendant in his personal capacity); *Goodwin v. Orange & Rockland Utilities, Inc.*, No. 04 Civ. 0207 (WCC), 2005 WL 2647929, *6 (S.D.N.Y. Oct. 14, 2005) (granting individual defendant summary judgment on Title VII sexual-harassment claim).

Individual liability is permitted under the NYSHRL and the NYCCRL, however. *See Tomka*, 66 F.3d at 1313; *see also Gregory v. Daly*, 243 F.3d 687, 689 n. 1 (2d Cir. 2001). Summary judgment motions on claims under those statutes are analyzed using the Title VII *McDonnell Douglas* framework, *infra*; *see supra* n. 15. Thus, the following discussion applies, unless otherwise noted, to Bowles's Title VII claims against Transit as well as to his New York City and State statutory claims against

both Transit and Cato.[23]

## 2. Bowles's Prima Facie Retaliation Case

Title VII's anti-retaliation provision, § 704(a), in pertinent part makes it unlawful for an employer to retaliate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, a plaintiff must show (1) his participation in a protected activity known to the defendant, (2) an employment action that disadvantages the plaintiff, and (3) a causal connection between the protected activity and the adverse employment action. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).

On Defendants' earlier motion for dismissal under FED.R.CIV.P. 12(b)(6), this Court held that Bowles had adduced facts in the Retaliation Complaint that could support an inference of retaliation. *See* Order in 03 Civ. 3073, dated March 18, 2004 (the "2004 Order").[24] Bowles has therefore made

---

[23]    Transit argues that a recent amendment to the New York Public Authorities Law § 1266(8) makes the NYCCRL inapplicable to Transit, *see* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 15. I need not reach this issue because I find that, on this record, Transit cannot be held liable.

[24]    I note that, in their earlier motion to dismiss, Defendants had argued that individual defendant Cato was entitled to qualified immunity. In the 2004 Order I held that if Cato had denied the grievance in retaliation for Bowles having filed the Accommodation Action, he violated a clearly established federal statutory right and thus was not entitled to qualified

out the elements of his retaliation claim.[25]

### 3. The *McDonnell Douglas* Framework

By making out a prima facie case of retaliation, a
plaintiff raises a rebuttable presumption that discriminatory
retaliation occurred.  *Jute v. Hamilton Sundstrand Corp.*, 420
F.3d 166, 173 (2d Cir. 2005).  The burden then shifts to the
defendant to rebut that presumption, under the *McDonnell Douglas*
framework, by putting forward legitimate reasons for its
challenged actions.  If the defendant carries that burden,
plaintiff, to survive summary judgment, must be able to point to

immunity.  I therefore declined to dismiss as against Cato, because Cato's
intent is of course an issue of fact which could not be decided on a motion
to dismiss.  *See* 2004 Order at 6 - 7.

    Defendants now point out that individual liability is not available at
any rate under Title VII, *see supra* IV. B. 1., and so the Title VII claim
against Cato should have been dismissed in the 2004 Order.

    Defendants do not assert Cato's qualified immunity under the NYHRL or
the NYCHRL in their instant motion for summary judgment.  However, I need not
decide whether such a defense is available, because I grant summary judgment
to Defendants on other grounds.

[25]    There is no dispute as to the first element of the Retaliation Claim:
in filing the Accommodation Action, Bowles was clearly engaged in a protected
activity that was known to Transit.  I note that, in a footnote in its
Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment
("Def. Retaliation Opposition"), Transit alleges that the June 2000 filing of
the Accommodation Action was "untimely for Title VII purposes."  But the
Accommodation Action *was* timely filed, *see supra* n. 7.  Transit does not
elsewhere articulate this untimeliness argument, and accordingly the Court
does not consider it further.

    As for the second element, in the 2004 Order the Court found that
Bowles had adequately alleged that Cato's denial of his grievance was an
adverse employment action, and clearly Transit's two terminations of Bowles's
employment qualify as adverse employment actions.

    As for the third element, I find that Bowles has adduced facts from
which a trier of fact might reasonably conclude that there was a causal link
between his filing the Accommodation Action on the one hand, and Cato's
denial of his grievance and Bowles's two terminations on the other.  But
again, because I find that Bowles fails to meet his *next* burden, that of
demonstrating that Transit's proffered reasons for its actions are
pretextual, I will discuss the causation element in that context, *see* IV. B.
5., *infra.*

evidence from which a finder of fact could reasonably conclude that the proffered legitimate reasons were merely a pretext for impermissible retaliation. *See, e.g., id.; Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir. 1998).

A court must carefully weigh "[t]he probative value of the proof that the employer's explanation is false" when deciding summary judgment. *Sanderson Plumbing,* 530 U.S. at 148. Under *James v. New York Racing Ass'n,* 233 F.3d 149, 153-54 (2d Cir. 2000), even an adequate demonstration by a plaintiff of the falsity of the employer's proffered explanation is not necessarily enough to survive a motion for summary judgment, because proof that the employer's explanations were false would not necessarily constitute affirmative evidence that the real reason was prohibited discrimination:

> The requirements of the *McDonnell Douglas* prima facie case are so minimal that they do not *necessarily* support any inference of discrimination; and there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason - without more - does not necessarily give logical support to an inference of discrimination.

*James,* 233 F.3d at 154 (emphasis added). A court must "analyze the particular evidence to determine whether it reasonably supports an inference of the [discrimination] plaintiff must prove." *Id.* at 157. *See also Sanderson Plumbing*, 530 U.S. at 148:

[A] plaintiff's prima facie case, combined with
sufficient evidence to find that the employer's
asserted justification is false, may permit the trier
of fact to conclude that the employer unlawfully
discriminated. This is not to say that such a showing
by the plaintiff will *always* be adequate to sustain a
jury's finding of liability. Certainly there will be
instances where, although the plaintiff has
established a prima facie case and set forth
sufficient evidence to reject the defendant's
explanation, no rational factfinder could conclude
that the action was discriminatory. For instance, an
employer would be entitled to judgment as a matter of
law if the record conclusively revealed some other,
nondiscriminatory reason for the employer's decision,
or if the plaintiff created only a weak issue of fact
as to whether the employer's reason was untrue and
there was abundant and uncontroverted independent
evidence that no discrimination had occurred.

Of the various actions which Bowles alleges he suffered in
retaliation for his filing of the Accommodation Action, his
March 12, 2002 termination, Cato's denial of his grievance of
that termination, and his second termination on November 18,
2003 were the only ones that even arguably qualify as adverse
employment actions.[26] His claim must therefore stand or fall on

---

[26] The other actions Bowles complains of – being warned regarding his use
of sick leave, being assigned tasks outside his job classification, being
denied the use of a vacation day to attend depositions, having "confidential
information regarding [his] medical status" revealed to other employees,
being required to work through lunch on six days, *see supra* II.C. for details
– do not rise to the level of "adverse employment actions," either
individually or cumulatively. Although Title VII does not define adverse
employment actions "solely in terms of job termination or reduced wages and
benefits, and that less flagrant reprisals by employers may indeed be
adverse," *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997),
"not every unpleasant matter short of [discharge or demotion] creates a cause
of action" under the Act. *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.
1994). As the Second Circuit has explained, "An adverse employment action is
a materially adverse change in the terms and conditions of employment."
*Schiano v. Quality Payroll Systems, Inc.,* 2006 WL 1075206, at *9 (2d Cir.
2006) (internal quotations and citations omitted); *see also supra* n. 25.
Here, even considered cumulatively, the incidents cited by Bowles aside from

these incidents, and I will focus the following discussion on Transit's explanation of them and on Bowles's proof that Transit's explanation is pretextual.

But first I must consider a threshold matter. Bowles argues that Transit is estopped from putting forward its purported legitimate reasons for his 2002 termination because it was decided in Arbitration Award I that the termination was wrongful, and therefore as a matter of law it could not have been for legitimate reasons.[27]

### 4. Issue Preclusion

Bowles argues that Arbitration Award I "fully exonerated Plaintiff and disposed of the merits of the Transit Authority's positions concerning the Civil Service Law, the timeliness of his grievance and Plaintiff's employment classification." Pltf. Retaliation Memo at 7. He further notes that "New York State courts have long recognized that [issue preclusion] principles are applicable to arbitration awards," *id.* at 18 (citing *Matter of American Ins. Co.*, 43 N.Y.2d 184, 371 N.E.2d 798, 401 N.Y.S.2d 36 (1977); *Clemens v. Apple*, 65 N.Y.2d 747, 481 N.E.2d

_____

Cato's denial of his grievance and the two terminations do not constitute a materially adverse change in the terms and conditions of his employment.

[27] Bowles raises a similar argument regarding his second termination, with regard to which Arbitration Award II was issued on July 19, 2005. He characterizes that decision as holding that the second termination was also improper. However, as Transit points out in Def. Retaliation Opposition at 14, the arbitrator found that Bowles had been terminated "prematurely," i.e., before the collective bargaining agreement ("CBA") allowed. It is undisputed that, while he postponed its effectiveness to January 25, 2004, the arbitrator actually *sustained* the termination, and so did not hold that it was improper. *See* Exhibit W to Pltf. Retaliation Motion.

560, 492 N.Y.S.2d 20 (1985)).  Bowles also cites *Collins v.*

*N.Y.C.T.A,* a decision in which the Second Circuit found that the

finding of "an undisputedly independent, neutral, and unbiased"

arbitrator that Transit had not intentionally discriminated was

"highly probative" of the same issue for purposes of a Title VII

claim.  305 F.3d 113, 119 (2d Cir. 2002).

Bowles overstates the holding of *Collins.*  That case does

not hold that the decisions of arbitrators *must* be given

preclusive effect in federal court.  In fact, after the sentence

Bowles quotes, the court cites *Alexander v. Gardner-Denver Co.,*

415 U.S. 36, 60 n. 21, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), in

which the Supreme Court held that the decision of how much

weight to give a particular arbitration decision is left to a

court's discretion and depends on the facts and circumstances of

each case.  I am thus free to decide how heavily to weigh the

findings from both of Bowles's arbitration proceedings in

considering his Title VII claims.

The decisions of the arbitrator may, however, be entitled

to preclusive effect with regard to the State and City law

claims.  The critical questions are whether there is an identity

of issue, and whether the defendant had a full and fair

opportunity to contest the decision.  *See Schwartz v. Public*

*Adm'r of Bronx County,* 24 N.Y.2d at 71, 298 N.Y.S.2d at 960, 246

N.E.2d 725 (1969).  "The burden of proving identity of the issue

rests on the proponent of [issue preclusion], while the opponent
bears the burden of proving that he or she did not have a full
and fair opportunity to litigate the issue." *Kosakow,* 274 F.3d
at 730 (citing *Public Adm'r of Bronx County,* 24 N.Y.2d at 73,
298 N.Y.S.2d at 962, 246 N.E.2d 725).  Here, as explained below,
Bowles cannot meet his burden of proving identity of issue.

It is undisputed that the March 2003 termination was made
on the recommendation of the Case Management Committee of
Transit's Workers Compensation Unit.  That committee had
determined that Bowles could be fired under the collective
bargaining agreement ("CBA") because the medical evaluations in
his file showed that his back injury – which by that time had
caused him to miss more than seven months of work – was
permanent and would prevent him from ever being able to return
to work as a Subway Cleaner.  Cato heard Bowles's first-level
grievance of that termination and denied it, and it eventually
went to arbitration, resulting in Arbitration Award I.

After considering the applicable portions of the Civil
Service Law and the CBA, the arbitrator ruled that "whether or
not an employee is considered permanently disqualified, the
Authority is not permitted to terminate such a disqualified
employee under [the CBA] for at least a year."  Because Bowles
had been fired within a year of first becoming disqualified due
to his injury, the arbitrator ordered him reinstated.

Thus, the arbitrator's finding that Bowles had been wrongfully terminated was based on his interpretation of the interaction of the Civil Service Law and the CBA. In making that decision he expressed no opinion as to whether Transit had discriminated or retaliated against Bowles. Indeed, the arbitrator did not even consider those questions. The issue of whether Transit's reasons for the termination were discriminatory, in the sense required under Title VII, the NYSHRL, and the NYCCRL, was not before the arbitrator. Thus his decision does not preclude Defendants from proffering here their justifications for the actions they took against Bowles.

### 5. Defendants' Proffered Legitimate Reasons for Their Actions and Bowles's Evidence of Pretext

Defendants explain that (1) Bowles was fired in 2002 because of prolonged absence from work due to his injury; (2) that Cato had denied Bowles's grievance of that firing because it was untimely under the CBA and because the requested relief – reclassification – was unavailable to those in Bowles's job classification, *see supra* n. 11; and finally (3) that Bowles was fired in 2003 because of further absences.

At this point, the burden shifts back to Bowles to demonstrate that these proffered reasons are pretextual and that the firing was motivated by Defendants' discriminatory animus. *Cf. Vernon v. Port Authority of New York and New Jersey*, 154

F.Supp.2d 844, 854 (S.D.N.Y. 2001).[28]  He may show pretext either

by presenting additional evidence that Transit's reasons are

"unworthy of credence" or by relying solely on the evidence he

has produced in making his prima facie case.  *Cf. Chambers,* 43

F.3d at 38 (quoting *Burdine,* 450 U.S. at 256).

    To be sure, "[t]here is no categorical rule that the

plaintiff must offer, in addition to his prima facie case and

evidence of pretext, further evidence that discrimination was

the actual motivation."  *Id.* (interpreting *Sanderson Plumbing,*

530 U.S. at 143).  Here, however, Bowles offers nothing more

than conclusory statements in support of his claim that

Defendants' proffered reasons are pretextual, and this is

insufficient to meet his burden.  *See Cobb v. Pozzi*, 363 F.3d

89, 108-09 (2d Cir. 2003) (retaliation claim cannot be based on

"conclusory assertions" but must be based on "some tangible

proof to demonstrate that [plaintiff's] version of what occurred

was not imaginary").

    Transit's proffered explanation of Bowles's 2002 firing,

set forth above, is not contradicted by Bowles's conclusory

allegations.  Bowles produces no evidence that the members of

---

[28]    Such discriminatory animus need not be shown to be the only reason for
the adverse job actions Bowles suffered, *cf. Terry v. Ashcroft*, 336 F.3d 128,
140-41(2d Cir. 2003) ("Title VII is violated when 'a retaliatory motive plays
a part in adverse employment actions toward an employee, whether or not it
was the sole cause,'" citing *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033,
1039 (2d Cir. 1993)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v.
Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("A retaliatory
motive must be, however, at least a 'substantial' or 'motivating' factor
behind the adverse action," (internal quotations and citations omitted)).

the Case Management Committee of the Workers Compensation Unit were involved in or even aware of the denial of accommodation, or that they were aware of the Accommodation Action.  This leaves him unable to show that the Committee's action was taken in retaliation for the filing of his suit.  Similarly, Bowles produces no evidence that the Committee was aware of any of the other complaints to which he alludes.  Finally, he mischaracterizes both the substance of Arbitration Award I and that award's effect on these proceedings.  In short, Bowles fails to show that Defendants' explanation for the 2002 firing is pretextual.

As for Cato's denial of Bowles's grievance of the 2002 firing, Cato's awareness of the Accommodation Action at the time when he heard and denied the grievance *does* reasonably support the inference of retaliation, as I noted in the 2004 Order.  In turn, that inference supports the claim of pretext.

"When the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  *Collette v. St. Luke's Roosevelt Hospital*, No. 99 Civ. 4864 (GEL), 2002 WL 31159103 *4 (S.D.N.Y. Sept. 26, 2002) (internal quotations omitted) (quoting *Schnabel*

*v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000)). Defendants have proffered a credible explanation for Cato's denial of the grievance: that Cato reasonably believed that it was untimely under the CBA, and that Bowles could not be reclassified as requested. Bowles's attempted rebuttal of this explanation is nothing more than the sort of talismanic "incantation of intent or state of mind" against which the Circuit has warned, *see Meiri*, 759 F.2d at 998. On this record, Bowles could not persuade a rational finder of fact that the explanation is pretextual, and that Cato denied his grievance in retaliation for the filing of the Accommodation Action.

Finally, Defendants' explanation for the November 18, 2003 termination – that it was due to excessive absences from work – is supported by credible evidence, and uncontradicted by Bowles. Weighing all the record, as I must at this stage, I find that Defendants' proffered justifications for their actions far overbalance the meager evidence Bowles musters in support of an inference of retaliation. Bowles's motion for summary judgment on his retaliation claims is therefore DENIED, and Defendants' motions on the same claims are GRANTED.

## C. The First Amendment Claims

Bowles alleges the violation of his rights under the First Amendment in both the Accommodation and the Retaliation Actions, and those allegations remain to be considered. First, Bowles

alleges that Transit violated his "free exercise rights under the First Amendment pursuant to 42 U.S.C. § 1983, in that . . . Plaintiff has been required to work on Sunday, his Sabbath." Accommodation Complaint at ¶ 30. However, the Second Circuit has held that a plaintiff may bring concurrent claims under Title VII and other civil rights statutes only when those claims allege the violation of distinct substantive rights or have sufficiently distinct factual bases. *See Carrero v. New York City Housing Authority*, 890 F.2d 569, 576 (2d Cir. 1989). Here, Bowles's allegations that Transit required him to work on Sunday form the factual basis of his Title VII accommodation claim, and do not implicate Bowles's rights in a way sufficiently distinct to support a separate First Amendment claim.

Bowles does not actually assert a separate First Amendment claim in the Retaliation Action, *see* n. 2, *supra*; however, I note that such a claim would similarly be precluded. Bowles alleges that Transit retaliated against him for having filed the Accommodation Action and various internal grievances. Those activities form the factual basis of his Title VII retaliation claim and, under *Carrero*, do not implicate Bowles's rights in a way sufficiently distinct to support a separate First Amendment retaliation claim.

Elsewhere in his submissions Bowles claims that Transit's admitted informal policy of "automatically" offering Thursdays

and Fridays off to those who seek religious accommodations "favors certain religions over others." Memorandum of Law in Opposition to Defendant's Motion and in Support of his Cross-Motion ("Pltf. Opposition Memo"), at 31-32. Although Bowles continues to characterize this as a violation of his "free exercise rights," such a claim is better analyzed under the Equal Protection Clause of the Fourteenth Amendment[29] and as such raises issues sufficiently distinct from his Title VII claims to warrant separate consideration.[30]

It is well-settled that a municipal agency will incur § 1983 Fourteenth Amendment liability when it is shown to have an official policy that is illegal, or when its unofficial discriminatory practices are so persistent and widespread as to constitute a "custom or usage," regardless of what its written policy might be. *See, e.g., Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (citing *Monell v. Dep't of Social Svcs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

Bowles does not present any evidence that raises a genuine issue of fact for trial on this claim. First, to the extent that he alleges Transit's official accommodation policy is

---

[29] The claim might also logically sound under the Establishment Clause of the First Amendment but, even so considered, cannot survive summary judgment for the reasons that follow.

[30] I note that Bowles does not actually specify this claim in either of his Complaints, and so the Court is not required to consider it.

illegally discriminatory on its face, this is simply untrue.
There is nothing in Transit's written policies specifying which
days off should be granted to those requesting religious
accommodations.  Second, the evidence before the Court
effectively contravenes any allegation that Transit's
"unofficial" accommodations policy constitutes an illegal custom
or usage.  Campo testified that the general practice in the
Stations Department was to offer Thursdays and Fridays off,
Campo Dep. at 29 l. 15 – 30 l. 23.  If this were Transit's
exclusive practice, it would indeed illegally favor those whose
Sabbath is Friday or Saturday over those whose Sabbath is
Sunday.  But there is uncontroverted evidence in the record that
Transit "frequently" grants requests for Sundays off, *see*
Harrison Dep. at 43 l. 2-25; *see also* Exhibit H to Gundersen
Aff.  In other words, the evidence shows that no matter how
"automatic" may have been the practice of offering Thursdays and
Fridays off, Transit also offered other days off in appropriate
circumstances.

Bowles's evidence that his own request was denied, even if
that denial were unconstitutional, is insufficient to anchor §
1983 liability against Transit because it is evidence not of an
express policy or an unofficial custom but only of a single
incident.  *See, e.g., Sorlucco*, 971 F.2d at 870 ("A municipal
agency may not be held liable under § 1983 simply for the

isolated unconstitutional acts of its employees," citing *Monell,* 436 U.S. at 694); *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy," citing *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989)).[31]  Thus, construed under the Equal Protection Clause, Bowles's claim still cannot survive summary judgment.

Accordingly, summary judgment is DENIED to Plaintiff Bowles and GRANTED to Defendant NYCTA on these claims as well, whether construed as sounding under the First or the Fourteenth Amendment.

### V. CONCLUSION

For the reasons set forth above, Bowles's motions for summary judgment are DENIED in their entirety, and Transit's

---

[31]     Bowles adduces evidence regarding another Transit employee, Reginald Peoples.  Bowles claims that Peoples was also denied an accommodation and that the denial was unconstitutional.  Transit objects that the evidence is inadmissible and so should not be considered on its motion for summary judgment.  I decline to reach the admissibility question, and hold in keeping with *Sorlucco* and *Ricciuti* that, even if there were admissible evidence showing that Transit did illegally deny Peoples an accommodation, the combined evidence of only two incidents would still be insufficient to show a "custom or usage" under the *Monell* standard.

motions for summary judgment are GRANTED in their entirety.  The

Clerk of the Court is directed to close the case.

**SO ORDERED:**

Barbara S. Jones
**UNITED STATES DISTRICT JUDGE**

Dated:     New York, New York
           May 23, 2006

44